Kimberly B. Turner, et al. v. City of Oklahoma City, et al.
Deposition of JEFFREY EUGENE COFFEY

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

KIMBERLY B. TURNER, as          )
Personal Representative of )
the Estate of ROBIN             )
LEANDER HOWARD, deceased,   )
                                )
          Plaintiff,            )
                                )
vs.                             )    No. CIV-14-112-W
                                )
THE CITY OF OKLAHOMA CITY, )
OKLAHOMA; JEFF COFFEY,          )
individually and in his    )
official capacity as a          )
police officer; DOUGLAS     )
GRADY, individually and in )
his official capacity as a )
police officer; and BILL   )
CITTY, individually and in )
his official capacity as        )
Chief of Police,                )
                                )
          Defendants.           )

**COPY**

DEPOSITION OF JEFFREY EUGENE COFFEY

TAKEN ON BEHALF OF THE PLAINTIFF

IN OKLAHOMA CITY, OKLAHOMA

ON OCTOBER 2, 2015

REPORTED BY:  KATHY FOREMAN, CSR #190

Kimberly B. Turner, et al. v. City of Oklahoma City, et al.
Deposition of JEFFREY EUGENE COFFEY

Page 5

1          Q      And were you the officer that

2     attempted to make the traffic stop, or are you

3     the officer that came on the scene afterwards?

4          A      Attempted to make the traffic stop.

5          Q      Why did you attempt to make a traffic

6     stop, sir?

7          A      Subject committed a traffic violation.

8          Q      And what was that traffic violation?

9          A      Straddling lane lines.

10          Q      What was your normal job assignment on

11     that particular day?

12          A      I was working a city-approved gang

13     overtime shift.

14          Q      And is that what you normally did?

15          A      No, sir.  My normal shift was the

16     Oklahoma City gang enforcement unit.

17          Q      Okay.  How did what you were doing on

18     that day differ from what you normally do?

19          A      It was just an overtime shift

20     enforcing gang activity.

21          Q      Was this something that you wanted to

22     do?

23          A      Yes, sir.  It's volunteer.

24          Q      Because, you know, sometimes people

25     when they are working are forced to work

Electronically signed by Kathy Foreman (501-360-976-4764)                    a0294875-b795-4f0d-b8f2-992e0fff6140

Kimberly B. Turner, et al. v. City of Oklahoma City, et al.
Deposition of JEFFREY EUGENE COFFEY

Page 7

1        A       No, sir.

2        Q       Specifically what do you mean by "he

3    was straddling the line"?

4        A       The two driver side tires on the

5    vehicle he was driving crossed the line without

6    him signaling his intention to change lanes, and

7    then he corrected himself back into his lane.

8        Q       When he did that, where was this

9    located?

10       A       Just north of 23rd, on North Kelley.

11       Q       And what did you do after you observed

12   him do this?

13       A       I activated my overhead lights.

14       Q       Were you in a police car?

15       A       I was in a marked Oklahoma City police

16   cruiser.

17       Q       Were you in that vehicle alone, or was

18   there another officer with you?

19       A       I had a partner with me.

20       Q       Who was that?

21       A       Sgt. Anderson.

22       Q       And you were driving?

23       A       Yes, sir.

24       Q       You then activated your lights and

25   siren?

Verbatim Reporting, LLC
Phone 405-232-8100 Fax 405-606-8767

Electronically signed by Kathy Foreman (501-360-976-4764)                    a0294875-b795-4f0d-b8f2-992e0fff6140

Kimberly B. Turner, et al. v. City of Oklahoma City, et al.
Deposition of JEFFREY EUGENE COFFEY

Page 8

1    A    I did.  Not siren, just lights.

2    Q    You did it, not Officer Anderson?

3    A    Correct.

4    Q    Does the -- When there are two

5    officers in the car, does the officer actually

6    doing the driving normally activate the lights?

7    A    I can't speak for other officers.  The

8    car is set up for a single officer's operation.

9         MS. KNIGHT:  Let's go off the

10   record for just a second.

11        (Brief recess)

12        MR. BERKOWITZ:  Let's go back on

13   the record now.

14   Q    (Mr. Berkowitz)  I take it, it is

15   physically easier for the driver to access the

16   lights than it would be for a fellow officer in

17   in the passenger seat?

18   A    They're located between the two seats,

19   but operational for me specifically, it's easier

20   from the driver's seat.

21   Q    When you work the gang enforcement

22   unit, do you normally have a partner with you?

23   A    The gang enforcement unit rides in a

24   two-man unit, yes, sir.

25   Q    I missed a word in there.

Electronically signed by Kathy Foreman (501-360-976-4764)          a0294875-b795-4f0d-b8f2-992e0fff6140

Kimberly B. Turner, et al. v. City of Oklahoma City, et al.
Deposition of JEFFREY EUGENE COFFEY

Page 9

1       A       "The gang enforcement unit rides in a
2    two-man unit, yes, sir."
3       Q       Thank you.  So you turned on your
4    lights.  What happened next?
5       A       The subject failed to yield to my
6    emergency equipment.
7       Q       Okay.  And what happened after that?
8       A       He fled.
9       Q       What happened next?
10      A       After he fled?
11      Q       Yes.
12      A       He continued to flee.
13      Q       And continue telling me what happened.
14              MS. KNIGHT:  Do you have a
15   specific question for him instead of a
16   narrative?
17              THE WITNESS:  I guess I don't
18   understand the question.
19      Q       (Mr. Berkowitz)  Well, this fleeing,
20   does it still go on today, or did something else
21   happen?
22      A       It comes to an end, yes, sir.
23      Q       Tell me how it came to an end.
24      A       The vehicle crashed into a clothes
25   line.

Verbatim Reporting, LLC
Phone 405-232-8100 Fax 405-606-8767

Electronically signed by Kathy Foreman (501-360-976-4764)                                    a0294875-b795-4f0d-b8f2-992e0fff6140

Kimberly B. Turner, et al. v. City of Oklahoma City, et al.
Deposition of JEFFREY EUGENE COFFEY

Page 10

1       Q       And in between the beginning of him
2   fleeing and him crashing into a clothes line,
3   did his vehicle come in contact with anything
4   else?
5       A       It actually struck another vehicle,
6   yes, sir.
7       Q       Do you know -- Can you identify that
8   vehicle that it struck?
9       A       I cannot.
10      Q       Is that information contained in any
11  record anywhere?
12      A       That it struck a vehicle?
13      Q       Yes.
14      A       Yes, sir.
15      Q       Well, the identify of the vehicle that
16  was struck, is that information --
17      A       Not to my knowledge.
18      Q       At the very least, you didn't obtain
19  that; you've never obtained that information?
20      A       Correct.
21      Q       And you've never put it in any kind of
22  a report?
23              MR. SMITH:  Form.
24              MS. KNIGHT:  Object to the form.
25      Q       (Mr. Berkowitz)  Have you put the

Kimberly B. Turner, et al. v. City of Oklahoma City, et al.
Deposition of JEFFREY EUGENE COFFEY

Page 11

1      identify of that vehicle in any report?

2                  MS. KNIGHT:  Object to the form.

3          Q     (Mr. Berkowitz)  Go ahead.

4                  MS. KNIGHT:  What do you mean by

5      "identity of the vehicle"?

6          Q     (Mr. Berkowitz)  There's a vehicle?

7          A     Yes, sir.

8          Q     What kind of vehicle was it; who owned

9      it?

10         A     It was a light-colored sedan.

11         Q     Do you have any other information that

12     would allow me to identify the owner of that

13     vehicle?

14         A     No, sir, I do not.

15         Q     Do you have any information that would

16     allow me to confirm that this happened, that

17     this vehicle was made contact with?

18                 MR. SMITH:  Object to form.

19                 MS. KNIGHT:  Same objection.

20         Q     (Mr. Berkowitz)  Go ahead.  Do you

21     have any information about that vehicle

22     whatsoever?

23                 MR. SMITH:  That's the same

24     question.

25                 MS. KNIGHT:  Other than what he's

Electronically signed by Kathy Foreman (501-360-976-4764)                a0294875-b795-4f0d-b8f2-992e0fff6140

Kimberly B. Turner, et al. v. City of Oklahoma City, et al.
Deposition of JEFFREY EUGENE COFFEY

Page 12

1    told you and what's in his report?

2              MR. BERKOWITZ:  Yes.

3              THE WITNESS:  My partner's report

4    would also reflect that.

5         Q    (Mr. Berkowitz)  Okay.  Have you read

6    your partner's report?

7         A    I have.

8         Q    And by "your partner," you're talking

9    about Officer Anderson?

10        A    Sgt. Anderson, yes, sir.

11        Q    And you said that there was contact

12   with a clothes line.  Was it an actual clothes

13   line or like a post holding up a clothes line?

14        A    I believe it to be a steel post with a

15   T at the top, what I would consider to be an

16   actual clothes line.

17        Q    Okay.  And after the car hit this

18   clothes line, what happened next?

19        A    The subject fled from the vehicle on

20   foot.

21        Q    And where was the clothes line?

22        A    It was beind a house.

23        Q    And do you know the address of the

24   house?

25        A    1412 Monticello Court.

Electronically signed by Kathy Foreman (501-360-976-4764)          a0294875-b795-4f0d-b8f2-992e0fff6140

Kimberly B. Turner, et al. v. City of Oklahoma City, et al.
Deposition of JEFFREY EUGENE COFFEY

Page 14

 1      A     I have.

 2      Q     And what did he report that he did?

 3      A     I cannot recall.

 4      Q     So you exited the vehicle, and what

 5   did you do next?

 6      A     Pursued the subject on foot.

 7      Q     Okay.  Did you eventually catch up to

 8   him?

 9      A     Yes, sir.

10      Q     How far did you go before catching up

11   to him?

12      A     Approximately 20 to 30 yards.

13      Q     When you caught up to him, what did

14   you do?

15      A     Attempted to take the subject into

16   custody.

17      Q     How did you do that?

18      A     Well, our definition of custody is

19   placing handcuffs on someone, so...

20      Q     And how did you attempt to accomplish

21   this?

22      A     I don't guess I understand the

23   question, sir.

24      Q     You eventually did take him into

25   custody?

Electronically signed by Kathy Foreman (501-360-976-4764)                                    a0294875-b795-4f0d-b8f2-992e0fff6140

Kimberly B. Turner, et al. v. City of Oklahoma City, et al.
Deposition of JEFFREY EUGENE COFFEY

Page 24

1      Officer Grady got there?

2          A      Yes, sir.

3          Q      Okay.  When you had him on the ground

4      but before you got him in the handcuffs, where

5      were his hands?

6          A      The situation was dynamic.  They were

7      in different spots.

8          Q      Where did his hands start out?

9          A      Immediately upon hitting the ground?

10         Q      Yes, sir.

11         A      He postured up in a runner's stance to

12     head to the south.

13         Q      I'm sorry?

14         A      Postured up in a runner's stance,

15     similar to what you would see someone beginning

16     a race, to take off back to the south in an

17     attempt to flee.

18         Q      What did you do in response to that?

19         A      I took my left hand and put it up near

20     his shoulder and my right hand down near his

21     waist, attempting to secure the subject.

22                As he was attempting to flee, I

23     attempted to apply strike force pressure, using

24     his knee to his common peroneal to sustain

25     contemporary reflexive inhibitions to that nerve

Electronically signed by Kathy Foreman (501-360-976-4764)
a0294875-b795-4f0d-b8f2-992e0fff6140

Kimberly B. Turner, et al. v. City of Oklahoma City, et al.
Deposition of JEFFREY EUGENE COFFEY

Page 25

1    bundle.

2         Q     Okay.  Can you say that in less

3    technical language?

4         A     There's a large nerve bundle on the

5    outside of your thigh.  When pressure is applied

6    to that nerve bundle, it tenses your body enough

7    that I was hoping to be able to gain control of

8    his left arm and place it behind his back.

9         Q     Okay.  Correct me if I'm wrong.  What

10   you described as a runner's stance, are both of

11   his hands on the ground?

12        A     They are at this time.

13        Q     And your first goal is to apparently

14   gain control of his left hand and arm?

15        A     That's the end goal.  When someone is

16   attempting to flee, the first goal is to put

17   them back on the ground.

18        Q     Were you successful in getting him

19   back on the ground?

20        A     Yes, sir.

21        Q     And could you describe how you did it

22   but in different language from what you used?

23              A lot of that language that you used

24   just seemed very technical to me.  Could you use

25   it in more common language?

Electronically signed by Kathy Foreman (501-360-976-4764)                    a0294875-b795-4f0d-b8f2-992e0fff6140

Kimberly B. Turner, et al. v. City of Oklahoma City, et al.
Deposition of JEFFREY EUGENE COFFEY

Page 26

1          MS. KNIGHT:  Object to the form of

2     that question.  Go ahead.

3          THE WITNESS:  I used my knee to

4     apply pressure to that large nerve bundle in his

5     thigh.

6     Q     (Mr. Berkowitz)  In attempting -- and

7     in attempting to do that, do you place your knee

8     on that spot on his body, or do you --

9          Well, how do you accomplish putting

10    your knee, making the contact with your knee

11    with his body?

12    A     That nerve bundle is under a very

13    large muscle.  In order to access that nerve

14    bundle, you have to apply force.

15    Q     And what do you mean by "applying

16    force"?

17    A     It's going to be a strike.

18    Q     So it's a strike as opposed to just

19    placing it and putting pressure against it?

20    A     Yes, sir.

21    Q     So you struck that spot with your

22    knee?

23    A     I was unable to do so.

24    Q     And why not?

25    A     Fights are dynamic, and the subject

Electronically signed by Kathy Foreman (501-360-976-4764)                    a0294875-b795-4f0d-b8f2-992e0fff6140

Kimberly B. Turner, et al. v. City of Oklahoma City, et al.
Deposition of JEFFREY EUGENE COFFEY

Page 27

1    was moving.

2         Q    So you attempted to do it, and you

3    missed?

4         A    Yes, sir.

5         Q    You missed the spot that you were

6    trying to strike?

7         A    Yes, sir.

8         Q    When you missed, did you miss him

9    completely, or did your knee come in contact

10   with another part of his body?

11        A    No, sir.  As I was performing the

12   strike, he rocked back to attempt to gain

13   momentum to go forward, causing my knee to

14   strike him in the lower abdomen.

15        Q    Which side of his body were you on?

16        A    The left side.

17        Q    And where on his abdomen did you

18   strike him?

19        A    I couldn't tell you specifically.

20        Q    Can you tell me approximately, whether

21   it be on his left side of his abdomen, right

22   side, middle?

23        A    Oh, it would be on the left side.  He

24   was face down.

25        Q    How did he react to being struck in

Kimberly B. Turner, et al. v. City of Oklahoma City, et al.
Deposition of JEFFREY EUGENE COFFEY

Page 28

1      the abdomen?

2            A      He fell back to the ground.

3            Q      And when he fell to the ground, where

4      are his hands now?

5            A      Underneath him.

6            Q      And did he say anything to you?  Had

7      he said anything to you at this point?

8            A      No, sir.

9            Q      Had he said anything at all at this

10     point?

11           A      Not that I recall.

12           Q      If he did, would that be something

13     that would normally be put into a report?

14           A      Yes, sir, typically.

15           Q      What did you do next?

16           A      The subject's actions actually

17     determine mine.  After hitting the ground, he

18     immediately tried to posture up again to flee

19     back south.

20           Q      And describe what this posture was.

21           A      A runner's stance again.

22           Q      So he basically did the same thing

23     again?

24           A      Yes, sir.

25           Q      So what did you do now?

Electronically signed by Kathy Foreman (501-360-976-4764)          a0294875-b795-4f0d-b8f2-992e0fff6140

Kimberly B. Turner, et al. v. City of Oklahoma City, et al.
Deposition of JEFFREY EUGENE COFFEY

Page 29

1      A      I attempted to access that nerve

2    bundle using my knee again.

3      A      Were you successful?

4      A      No, sir.

5      Q      What happened?

6      A      I struck him in his lower abdomen.

7      Q      How did he react to that?

8      A      He fell back to the ground.

9      Q      Where are his hands?

10     A      This time they went -- they were

11   underneath his body, but they were in a downward

12   motion back towards his waistband.

13     Q      So he was able to move them downward

14   with his body on top of his hands?

15     A      Sir, I'm not sure when he got them

16   down there, but they were down there once he hit

17   the ground, yes, sir.

18     Q      So he's now down on the ground, if I'm

19   counting right, for the third time.  You had

20   taken him to the ground.  He popped up.  You got

21   him down.  He popped up again.  You got him

22   down.

23     A      Yes, sir.

24     Q      On this third time that you got him

25   down, his hands are under his body, right?

Electronically signed by Kathy Foreman (501-360-976-4764)   a0294875-b795-4f0d-b8f2-992e0fff6140

Kimberly B. Turner, et al. v. City of Oklahoma City, et al.
Deposition of JEFFREY EUGENE COFFEY

Page 30

1        A      Correct.

2        Q      And did you become aware at some point

3    of his hands that are under his body moving down

4    towards his waistband?

5        A      I don't specifically remember him

6    moving them, no, sir.

7        Q      What did you do next?

8        A      I was able to apply a third knee

9    strike and made contact with his common peroneal

10   at that time.

11       Q      And how did he react to doing that?

12       A      This time he was on the ground.  It

13   was not nearly as dynamic, and I was able to

14   pull out his left arm while accessing that nerve

15   bundle.

16       Q      During these series of events that

17   we've just been talking about, where he's

18   first -- you first have him down, he pops up

19   into the stance, you get him down, he pops up

20   again, and then you get his arm out from under

21   him --

22              Officer Grady, when did he actually

23   come into the event?

24       A      Sgt. Grady was able to vault the fence

25   and assist me prior to the third strike force

Kimberly B. Turner, et al. v. City of Oklahoma City, et al.
Deposition of JEFFREY EUGENE COFFEY

Page 34

1      A      Yes, sir.

2      Q      Describe for me how you got him in

3   handcuffs now.

4      A      Placed both arms behind his back and

5   applied the handcuffs.

6      Q      Did anything -- did you notice

7   anything unusual when you took his arms -- you

8   and Sgt. Grady took his arms behind him and put

9   the cuffs on him?

10      A      Not when I took them behind him, no,

11   sir.

12      Q      Did you, for example -- I think I read

13   in a report that somebody heard a pop or a

14   crack.  Did you hear a pop or a crack?

15      A      Yes, sir.

16      Q      Tell me what you heard.

17      A      It was a popping sound, and it felt

18   much like when someone's arm was to go out of

19   socket, in my opinion.

20      Q      Okay.  And when did you make that

21   observation?

22      A      As his arm was coming out from

23   underneath him.

24      Q      And did this gentleman make any kind

25   of auditory sound when that happened?

Electronically signed by Kathy Foreman (501-360-976-4764)                    a0294875-b795-4f0d-b8f2-992e0fff6140

Kimberly B. Turner, et al. v. City of Oklahoma City, et al.
Deposition of JEFFREY EUGENE COFFEY

Page 35

```
 1        A      Not that I recall.

 2        Q      Okay.  Did he utter any words

 3   whatsoever?

 4        A      No, sir.

 5        Q      Did you ever hear this man speak any

 6   words at all?

 7        A      Yes, sir.

 8        Q      When did you first hear him say any

 9   words at all?

10        A      During the transport.

11        Q      Okay.  And by "transport," you've got

12   him in your police car?

13        A      Correct.

14        Q      All right.  You've got him now in the

15   handcuffs.  What did you do next?

16        A      I removed myself from the situation

17   and advised on the radio for EMSA and to let

18   everybody know the subject was in custody.

19        Q      And why did you call for EMSA?

20        A      He had been involved in a vehicular

21   collision and the popping sound concerned me.

22        Q      Okay.  And what do you mean by

23   "concerned" you?

24        A      I've put many people in handcuffs, and

25   I have not heard a popping sound like that.
```

Electronically signed by Kathy Foreman (501-360-976-4764)                    a0294875-b795-4f0d-b8f2-992e0fff6140

Kimberly B. Turner, et al. v. City of Oklahoma City, et al.
Deposition of JEFFREY EUGENE COFFEY

Page 41

1      Q     Okay.  Have you ever seen a report

2    from the fire department after they arrive on a

3    scene?

4      A     Not that I recall.

5      Q     Okay.  So the firemen walked away, and

6    I take it they left the scene?

7      A     Yes, sir.

8      Q     And did the EMSA arrive before or

9    after the fire department left the scene?

10     A     Prior to.

11     Q     And based on whatever the firemen were

12   saying, I take it, EMSA just left the scene?

13     A     Yes, sir.

14     Q     Did you have any communication with

15   the EMSA personnel?

16     A     I did.

17     Q     Describe the contact you had with the

18   EMSA personnel.

19     A     I explained something to the effect:

20   If he was refusing medical treatment by fire, I

21   was going to transport him to the hospital, so

22   they were no longer needed on scene.

23     Q     And even though he was refusing

24   medical treatment, you felt that he should be

25   taken to be checked out by medical personnel?

Kimberly B. Turner, et al. v. City of Oklahoma City, et al.
Deposition of JEFFREY EUGENE COFFEY

Page 42

1       A      I needed a medical clearance to put

2    him into the Oklahoma County jail, yes, sir.

3       Q      I take it the fire department, that's

4    not sufficient medical clearance?

5       A      I don't know Oklahoma County policies.

6    In my opinion it is not.

7       Q      And so if he needed -- if you needed

8    medical clearance, why not have the EMSA people

9    see the man?

10      A      EMSA doesn't complete the medical

11   clearance.  It's completed by a doctor.

12      Q      Okay.  All they do is make a

13   determination as to whether or not he should be

14   transported by ambulance or not?

15      A      Yes, sir.

16      Q      And where did you take him?

17      A      Southwest Medical Center.

18      Q      And why did you take him to Southwest?

19      A      Southwest Medical Center, they cater

20   to law enforcement.  I've been into other

21   hospitals that won't give you a room immediately

22   upon entering, and Southwest is very good about

23   getting you in and getting you to a room, so

24   you're not sitting outside with an arrested

25   subject.

Electronically signed by Kathy Foreman (501-360-976-4764)                    a0294875-b795-4f0d-b8f2-992e0fff6140

Kimberly B. Turner, et al. v. City of Oklahoma City, et al.
Deposition of JEFFREY EUGENE COFFEY

Page 51

1    backed away," did you step up and back away with

2    him?

3         A    No, sir.

4         Q    He's in handcuffs.  He's on the

5    ground.  You step up and back away?

6         A    Yes, sir.

7         Q    How far away did you step away?

8         A    Five to ten feet maybe.

9         Q    Okay.  How did this man get up off the

10   ground?

11        A    Sgt. Anderson assisted him.

12        Q    With Sgt. Grady?

13        A    I couldn't tell you, sir.

14        Q    Why did you step back?

15        A    I was getting on the radio to inform

16   all the officers coming that the subject was in

17   custody, and starting EMSA.

18        Q    And the cell phone that was found, did

19   you personally see it?

20        A    Yes, sir.

21        Q    When did you see it?

22        A    Shortly after he got up.

23        Q    Did you ever see it before he was

24   actually in custody?

25        A    I believe I did, yes, sir.

Electronically signed by Kathy Foreman (501-360-976-4764)                a0294875-b795-4f0d-b8f2-992e0fff6140

Kimberly B. Turner, et al. v. City of Oklahoma City, et al.
Deposition of JEFFREY EUGENE COFFEY

Page 52

1      Q     When you say you believe you did, what

2    do you mean?

3      A     As he was rounding the corner of the

4    house, I was able to observe something silver in

5    his hand.  At the time I didn't know if it was a

6    gun or a knife or possibly this silver cell

7    phone.

8      Q     You observed he had something in his

9    hand that you believed was silver?

10      A     Correct.

11      Q     Now, in addition to being deaf, I'm

12    also color blind.  By any chance are you color

13    blind?

14      A     No, sir.

15      Q     And this is during the day, isn't it?

16      A     Yes, it is.

17      Q     And you believe that what you observed

18    turned out to be the cell phone?

19      A     Yes, sir.

20      Q     Do you know whether or not that cell

21    phone is still in police custody?

22      A     I do not.

23      Q     What's the normal procedure for

24    property of that type in this situation?  Would

25    it normally still be held, or would it be

Electronically signed by Kathy Foreman (501-360-976-4764)                              a0294875-b795-4f0d-b8f2-992e0fff6140

Kimberly B. Turner, et al. v. City of Oklahoma City, et al.
Deposition of JEFFREY EUGENE COFFEY

Page 57

1    to put the cuffs on in front of them, then

2    obviously you don't have to put them behind

3    them?

4        A      That would be correct.

5        Q      Once you had this gentleman down on

6    the ground, his hands are pinned underneath him,

7    did you ask him or tell him to put his hands

8    behind him?

9        A      Absolutely.

10       Q      And did he give any kind of verbal

11   response to that?

12       A      No.

13       Q      Did he make any kind of reaction when

14   you asked him or told him to put his hands

15   behind him?

16       A      He made no effort to put his hands

17   behind his back.

18       Q      By the way, did you ask him or did you

19   tell him to put his hands behind him?

20       A      I told the subject.

21       Q      How did you do that?

22       A      "Put your hands behind your back."

23       Q      And when you're telling him to put his

24   hands behind his back, are you holding him down?

25       A      I am maintaining control of the

Kimberly B. Turner, et al. v. City of Oklahoma City, et al.
Deposition of JEFFREY EUGENE COFFEY

Page 59

1            MS. KNIGHT:   At what point?

2    Object to the form.

3        Q     (Mr. Berkowitz)   At the point where

4    just before you get his hands behind him, you've

5    asked him to get -- you've told him to put his

6    hands behind his back?

7        A     Multiple times.

8        Q     In between the last time that you got

9    him down on the ground and the time that you

10   yourself were able to get his hands behind his

11   back, he is flat on the ground with his hands

12   underneath him, correct?

13       A     Correct.

14       Q     During that period of time, if his

15   hands are under his body and you've got him down

16   on the ground, how could he get his hands out at

17   that point?

18       A     He was forcefully holding his hands in

19   a downward motion towards his waist underneath

20   him.   When I was attempting to pull his arm out,

21   I could feel the muscles in his arm as he was

22   pulling towards his core.

23       Q     So it's your testimony that he's

24   resisting?

25       A     Yes, sir.

Electronically signed by Kathy Foreman (501-360-976-4764)                    a0294875-b795-4f0d-b8f2-992e0fff6140